[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
April 27, 2006
THOMAS K. KAHN
CLERK

_____

No. 05-14352
Non-Argument Calendar

_____

BIA No. A95-551-284

MAURICIO ANDRES RAMIREZ BARCO,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

**(April 27, 2006)**

Before BIRCH, DUBINA and HULL, Circuit Judges.

PER CURIAM:

Mauricio Andres Ramirez-Barco petitions for review of the final order of the

Board of Immigration Appeals ("BIA"), which adopted the decision of the

immigration judge ("IJ") ordering removal, denying asylum and withholding of removal under the Immigration and Naturalization Act ("INA"), 8 U.S.C. §§ 1158, 1231, and denying relief under the United Nations Convention Against Torture ("CAT"), 8 C.F.R. § 208.16(c). Because Ramirez-Barco failed to exhaust his administrative remedies, we lack jurisdiction to review Ramirez's challenge of the IJ's denial of relief under CAT or of the IJ's adverse credibility finding, upon which the denial of asylum and withholding of removal was based. Accordingly, we DISMISS the petition as to CAT relief and DENY it as to relief under the INA.

## I. BACKGROUND

A. Application for Asylum

On 24 May 2002, Ramirez-Barco, a native and citizen of Colombia, filed an application for asylum and withholding of removal. The application listed his residences in Colombia for the period from December 1980 through June 2001. Administrative Record ("AR") at 172. It also indicated that he had last left Colombia on 17 June 2001, but had previously visited the United States in 1993 and 1999 and that he now sought asylum or withholding of relief based on his political opinion. Id. at 169, 173. More specifically, he asserted that his father had been murdered in Colombia in 1993, "possibly" in connection with his political activity and that Ramirez-Barco had received "threatening telephone calls" and had

2

been visited by two hooded men. Id. at 173. The application explained that Ramirez-Barco had been part of a youth group of community leaders supporting the Conservative Party, and that his father and aunt had both also been active in the Conservative Party. Id. at 174. He asserted that he and his family had been mentally tortured by the threats they had received. Id. Ramirez-Barco explained that, as a member of the conservative youth, he had told people to support state institutions and to reject the guerrilla groups. Id. at 179. He claimed that on 4 May 2001, he had received a telephone call from a man identifying himself as a member of the National Liberation Army ("ELN") who said that he would silence Ramirez-Barco if he continued his work in certain districts. Id. Ramirez-Barco asked to be assigned to another district, but received another telephone call from the same person after his transfer. Id. On 28 May 2001, two men wearing ski masks came to his house looking for him and left a threatening message with his sister. Id. Ramirez-Barco said that his mother and sister then begged him to leave Colombia. Id.

With his application, Ramirez-Barco submitted a 13 November 2001 letter about the threats made against him, a death certificate for his father, Mario Ramirez Quintero, which indicated that his death had been caused by injuries from a firearm, and several documents relating to his aunt's political activity. Id. at 181-

3

84, 191-201. He attached a 4 June 2001 police report listing a different address from any listed on the application. Id. at 185, 188. The report states that Ramirez-Barco had been receiving telephone threats for six months and that two "hooded men" had come to his house on 28 May to threaten him in person. Id. at 186, 189-90.

B. Notice to Appear and Asylum Hearing

On 9 July 2002, the Immigration and Naturalization Service ("INS")[1] issued a Notice To Appear ("NTA") to Ramirez-Barco, charging him with removability under 8 USC § 1227(a)(1)(B). Id. at 207. Ramirez-Barco conceded removability and the IJ designated him removable to Colombia. Id. at 39, 41-42. At his asylum hearing, Ramirez-Barco testified, through an interpreter, to much of the same information he gave in his application. He reported having first received a threatening telephone call from an ELN guerrilla on 4 May 2001. He testified that the caller threatened to kill him if he continued his work for the Conservative Party in the two neighborhoods in which he had been working. Id. at 56. He received another telephone call from the same person on 18 May 2001. Id. at 57. Ramirez-

---

[1] On 25 November 2002, President Bush signed into law the Homeland Security Act of 2002 ("HSA"), Pub. L. No. 107-296, 116 Stat. 2125. The HSA created a new Department of Homeland Security ("DHS"), abolished the INS, and transferred its functions to the new department. However, because this case was initiated while the INS was still in existence, this memorandum refers to the agency as the INS.

4

Barco testified that he had reported the first threat to the police, who told him to hang up the phone if he received other threats and said they could not offer him protection. Id. He did not report the second telephone call. Id. at 58.

Ramirez-Barco described in more detail how, on 28 May 2001, two people had come to his home and told his sister that if he continued to work in those neighborhoods, then the next time "they wouldn't waste their time coming to the house." Id. When Ramirez-Barco came home, his mother and sister told him about the two men and there was a police officer present. Id. at 59. At this point, Ramirez-Barco had already been reassigned to other neighborhoods for work, although he still occasionally returned to the original two. Id. at 58. His mother and sister told him that the two men had been dressed in black, wearing hoods on their heads, and carrying weapons. Id. at 60. Ramirez-Barco admitted that he had no corroborating evidence from his mother or sister regarding this 28 May incident. Id. at 68. Ramirez-Barco alleged that he could not relocate within Colombia because the guerrillas "have an extensive database, and once you become their objective, wherever you go, they find you." Id. at 62.

Ramirez-Barco testified about his father's death, but conceded that he was unable to produce a police report or any evidence of his father's political activities. Id. at 66-67. Ramirez-Barco conceded that he had never been tortured by the

5

Colombian government.  Id. at 71.  In response to questions regarding discrepancies in the addresses listed as his residence on various documents in the record, Ramirez-Barco claimed that there were some mistakes in his asylum application that needed to be corrected.  Id. at 71-72.  He also asserted that, in his city, a single address could be written in two completely different ways.  Id. at 73. When asked to explain why the police report listed a former address when he had moved by the time of the report, Ramirez-Barco asserted that his uncle had filed the report and must have mistakenly listed his old address.  Id. at 74.

At the hearing, Ramirez-Barco testified that he did not receive any telephone threats prior to May 4, 2001.  Id.  When asked why the June 4 report says that he had been receiving threats for the previous six months, Ramirez-Barco again asserted that his uncle had filed the report and must have confused the fact that some boys in the neighborhood had been warning Ramirez-Barco to watch out for six months.  Id.  The IJ pointed out that the report gave no indication of having been filed by anyone other than Ramirez-Barco himself.  Id. at 74-75.  Ramirez-Barco conceded that he had no evidence to corroborate this particular assertion.  Id. at 75.  He also testified that he had not personally received any telephone threats after 28 May 2001.  Id. at 76.  The IJ pointed out that the 4 June report stated that he had received threats between May 28 and June 4.  Id.

6

Ramirez-Barco denied ever having had any problems in Colombia in connection with his aunt Lucia Ramirez Quintero. Id. He also conceded that he was unable to produce any proof that he had been a member of the youth movement of the Conservative Party because "the man who was in charge of that type of information [had] advised [him] that they could not [provide it]. It was against the law." Id.

The record before the IJ also included the 2002 and 2003 U.S. Department of State Country Report on Human Rights Practices for Colombia (" Reports"). Both Reports indicate significant guerrilla activity – including "political murders [] and forced disappearances." Id. at 82, 133. Ramirez-Barco submitted documents, including, among other things: (1) a 10 July 2003 letter from the Colombian military stating that Ramirez-Barco was advised to leave the country because his father had been assassinated by narco-terrorists; (2) a 9 July 2003 letter from a church stating that Ramirez-Barco had received threats due to his community activities; and (3) a letter indicating that his aunt Lucia Ramirez Quintero had been granted asylum. Id. at 119-29.

C. Decision of the IJ

The IJ found that Ramirez-Barco had "failed to meet his burden of establishing that he suffered past persecution or that he has a well-founded fear of

7

persecution in Colombia on account of his . . . political opinion." Id. at 22. More specifically, the IJ found that Ramirez-Barco had failed to present credible detailed testimony that would "provide a plausible and coherent basis for his alleged fear of persecution." Id. at 23. The IJ found inconsistencies between Ramirez-Barco's testimony and the 4 June report and between his testimony and his corrected asylum application. Id.

The IJ further noted that the 4 June report did not confirm Ramirez-Barco's testimony that his uncle had filed the police report on his behalf and that Ramirez-Barco provided no corroborating evidence. Id. at 25. The IJ pointed to the further inconsistencies that (1) Ramirez-Barco's testimony that he first received a telephone threat on 4 May 2001 conflicted with the statement in the June 4 report that he had been receiving telephone threats for the six months preceding the report and (2) Ramirez-Barco's testimony that he did not receive any threats after 28 May conflicted with the statement in the report that the threats had continued up to the time the report was filed. Id. at 26.

The IJ was further concerned by the absence of documentary evidence indicating that guerrillas had been responsible for the death of Ramirez-Barco's father and pointed out that the death certificate only stated that he had died from injuries caused by a firearm. Id. at 27. The IJ further noted that Ramirez-Barco

8

had failed even to submit any evidence regarding his father's political activities and that he had not sought asylum until eight years after his father's death, despite the fact that he had visited the United States twice between 1993 and 2001. Id. at 27-28. She concluded that Ramirez-Barco had thus failed to prove a nexus between his asylum claim and his father's death. Id. at 27.

The IJ also observed that Ramirez-Barco's aunt was present during the hearing, but that Ramirez-Barco did not present testimony from her regarding either his father's death or his own political activities. Id. at 28. The IJ further noted that Ramirez-Barco's sister and mother were present in the United States at the time of the hearing, but that Ramirez-Barco did not present any evidence from either of them to corroborate his claims regarding the threats to his life. Id. at 29. The IJ concluded that Ramirez-Barco had also failed to demonstrate a nexus between his asylum claim and the asylum approval of his aunt, and even admitted that his claim was based on his own actions. Id. at 29-30.

The IJ also specifically addressed the other documentary evidence in the record and found that (1) the military letter lacked any sign of authenticity, particularly since Ramirez-Barco had never indicated that he had any contact with that specific battalion of the military; (2) the letter from the church merited no weight both because it was not subject to verification and bore a date subsequent to

9

Ramirez-Barco's departure from Colombia; and (3) the 13 November 2001 letter included with the asylum application, which reported Ramirez-Barco's uncle's reports of death threats against Ramirez-Barco, was "very general, " was "issued subsequent to [Ramirez-Barco's] departure from Colombia," and did "not identify the group or groups that allegedly threatened [him]." Id. at 30-31. Accordingly, the IJ found that Ramirez-Barco had "failed to present an overall credible claim for asylum" and denied asylum based on a lack of credibility and failure of proof. Id. at 31. The IJ further found that Ramirez-Barco failed to meet his burden of eligibility for withholding of removal or CAT relief. Id.

D. Appeals

Ramirez-Barco appealed the IJ's decision to the BIA, asserting that the IJ erred in denying asylum and withholding of removal because Ramirez-Barco had demonstrated that he was a military target and that he had been threatened with death due to his political activity. Id. at 14. In the brief in support of his appeal, he argued only that he had demonstrated a well-founded fear of future persecution. Id. at 6-7. Ramirez-Barco did not reference the IJ's adverse credibility finding, upon which the denial of asylum and withholding of removal had been based, nor did he refer to the denial of CAT relief in either his notice of appeal or brief. See id. at 5-7, 13-15. The BIA affirmed the IJ's decision without opinion.

10

In his petition for review, Ramirez-Barco now challenges the IJ's adverse credibility finding. He also argues the merits of his asylum and withholding of removal claims, arguing that he established past persecution on account of his political opinion based on the National Liberation Army's ("ELN") threatening phone calls and visit to his house. Finally, Ramirez-Barco argues that the IJ abused her discretion by denying CAT relief because he faced mental torment through the ELN's threatening phone calls and visit to his house.

## II. DISCUSSION

A. Jurisdiction

We first examine our jurisdiction to review Ramirez-Barco's arguments. "We review subject matter jurisdiction de novo." Ortega v. United States Att'y Gen., 416 F.3d 1348, 1350 (11th Cir. 2005) (per curiam). We may only review a final order of removal if "the alien has exhausted all administrative remedies available to the alien as of right." 8 U.S.C. § 1252(d)(1). Thus, the failure to raise a claim with the BIA prevents us from exercising jurisdiction over that claim. See Fernandez-Bernal v. Att'y Gen. of the U.S., 257 F.3d 1304, 1317 n.13 (11th Cir. 2001). More specifically, we have held that the failure of asylum applicant to raise certain challenges before the Board of Immigration Appeals in a deportation appeal proceeding constitutes a failure to exhaust administrative remedies, which

11

precludes review of those contentions on appeal. See Najjar v. Ashcroft, 257 F.3d 1262, 1285 n.14 (11th Cir. 2001).

In his brief to the BIA, Ramirez-Barco discussed his political activities and the threats he had received, and asserted that the IJ erred in not granting asylum and withholding of removal because he had demonstrated a well-founded fear of persecution based on membership in a protected class. He failed, however, to challenge either the district court's adverse credibility determination or the denial of CAT relief in its appeal to the BIA. The BIA did not consider these issues and, thus, there is no final agency decision with respect to them. Accordingly, we lack jurisdiction to review these issues.

B. Asylum and Withholding of Removal

Ramirez-Barco's more general argument that the IJ erred in denying asylum and withholding of removal because he had demonstrated a well-founded fear of persecution based upon membership in a protected class was addressed in his brief on appeal to the BIA. Thus, we have jurisdiction to review it. See 8 U.S.C. § 1252(d)(1). When the BIA issues a decision, we review only that decision, "except to the extent that it expressly adopts the IJ's opinion." Najjar, 257 F.3d at 1284. We review the IJ's opinion in this case because the BIA has adopted it in full. See D-Muhumed v. United States Att'y Gen., 388 F.3d 814, 818 (11th Cir.

2004). In so doing, we review legal determinations by the IJ de novo. Id. at 817.

We examine factual findings under the substantial evidence test. Id. at 817-18.

An alien who arrives in or is present in the United States "may apply for asylum." 8 U.S.C. § 1158(a)(1). To qualify for asylum, the alien must be a "refugee." Id. § 1158(b)(1)(A). A "refugee" is any person who is unwilling to return to her home country or to avail himself of that country's protection "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." Id. § 1101(a)(42)(A). The asylum applicant "bears the burden of proving such statutory "refugee" status. Al Najjar, 257 F.3d at 1284 (citing 8 C.F.R. § 208.13(a)). "The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration." Id. §§ 208.13(a), 208.16(b). On the other hand, "an adverse credibility determination alone may be sufficient to support the denial of an asylum application," although it does not "alleviate the IJ's duty to consider other evidence produced by an asylum applicant." Forgue v. United States Att'y. Gen., 401 F.3d 1282, 1287 (11th Cir. 2005). Finally, because the standard for withholding of removal is more stringent than the well-founded fear standard for asylum, an applicant unable to meet the standard for asylum, is generally unable to qualify for withholding of removal. See Al Najjar, 257 F.3d at 1292-93.

13

Here, the IJ denied Ramirez-Barco relief, in part, based on an adverse credibility finding with respect to his testimony. The IJ also carefully considered the evidence Ramirez-Barco submitted in support of his case and rejected it for specific, cogent reasons, grounded in the record. Because we lack jurisdiction to review the adverse credibility finding, because an adverse credibility determination is sufficient to support the denial of an asylum application, as long as all evidence has been taken into account, see Forgue, 401 F.3d at 1287, and because an applicant who does not qualify for asylum is generally unable to qualify for withholding of removal, see Al Najjar, 257 F.3d at 1292-93, we must deny the petition to the extent it generally challenges the denial of relief.

### III. CONCLUSION

Ramirez-Barco petitions for review of the final order of the BIA denying asylum and withholding of removal under the INA, and relief under CAT. Because Ramirez-Barco failed to exhaust his administrative remedies, we lack jurisdiction to review Ramirez's challenge of the IJ's denial of relief under CAT or of the IJ's adverse credibility finding, and we must **DISMISS** the petition as to these issues. Because the adverse credibility determination provides a sufficient basis for denial of relief, we **DENY** the petition as to relief under the INA.

**PETITION DISMISSED IN PART AND DENIED IN PART.**

14